Ross Goodman, Esquire
Goodman Law Group, P.C.
520 S. 4th Street
Las Vegas, NV  89101
T:  (702) 383-5088
F:  (702) 385-5088
email:  ross@goodmanlawgroup.com
Nevada Bar ID No. 7722
Attorneys for Plaintiff
Wellness Coaches USA, LLC


**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEVADA**

| | |
|---|---|
| WELLNESS COACHES USA, LLC<br>725 Skippack Pike, Suite 300<br>Blue Bell, PA  19422,<br><br>                Plaintiff,<br><br>    v.<br><br>MGM RESORTS INTERNATIONAL<br>3600 Las Vegas Blvd. S.<br>Las Vegas, NV  89109<br><br>and<br><br>LIFE TIME FITNESS, INC.<br>2902 Corporate Place<br>Chanhassen, MN  55317,<br><br>                Defendants. | Civil Action No. 2:15-CV-_01593___<br><br><br>TRIAL BY JURY DEMANDED |

## COMPLAINT

Plaintiff, Wellness Coaches USA, LLC ("WCUSA" or "Plaintiff") brings this action

against MGM Resorts International ("MGM") and Life Time Fitness, Inc. ("LTF") (jointly,

"Defendants") seeking injunctive relief and damages for, among other things, MGM's and LTF's unlawful actions in misappropriating WCUSA's confidential information and trade secrets, tortiously interfering with WCUSA's contractual relations and conspiring to solicit WCUSA's employees, all for the benefit of MGM and LTF and to the detriment of WCUSA.

## Jurisdiction and Venue

1.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity between the Plaintiff and Defendants and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

2.      This Court has personal jurisdiction over the Defendants because they both engage in business activities in Nevada.

3.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b)(2) because a substantial part of the events giving rise to the claim occurred in this district.

## The Parties

4.      WCUSA is a Pennsylvania limited liability company with members domiciled in Pennsylvania, New Jersey, Michigan and California. Therefore, WCUSA is considered a citizen of Pennsylvania, New Jersey, Michigan and California.

5.      Upon information and belief, at all times material hereto, MGM was and is a Delaware corporation with its principal place of business in Las Vegas, Nevada.  MGM is therefore considered a citizen of Delaware and Nevada.

6.      Upon information and belief, at all times material hereto, LTF was and is a Minnesota corporation with its principal place of business in Chanhassen, Minnesota.  LTF is therefore considered a citizen of Minnesota.

7.      Upon information and belief, LTF operates two fitness centers in Nevada.

**WCUSA Is the Leading National Provider of Onsite Wellness Coaching**

8.      WCUSA, headquartered in suburban Philadelphia, is the pioneer and leading national provider of onsite wellness coaching services delivered directly to employees in the workplace.

9.      WCUSA services over 500 client locations in more than 35 states in the U.S., including clients such as the City of Las Vegas, Tyco, DuPont and Federal Express.

10.     WCUSA implements its highly effective onsite wellness services through the deployment of highly trained, professional coaches at its customers' locations.

11.     WCUSA's model for wellness coaching is unique, as most wellness coaching today is done offsite, telephonically or via email.

12.     WCUSA equips its onsite coaches with the wellness industry's most advanced and comprehensive coaching infrastructure, which includes CoachWell, its proprietary coach support, training and development infrastructure; StageCoach, its proprietary coaching software and reporting system; and other proprietary management and operational protocols and processes.

13.     Upon information and belief, WCUSA is the only wellness services provider in the United States who has developed and validated the software necessary to effectively provide wellness coaching directly, personally and face-to-face to customers' employees at their place of work, by, among other things, tracking all daily employee-coach interaction data, and allowing coaches to manage their individual employee coaching regimes and assess employee progress.

This proprietary software also allows management to continuously assess coach performance and quality, evaluate and assess program outcomes and to provide client progress reports.

14.     WCUSA spends substantial time and resources to train and support its coaches on WCUSA's proprietary software and resources; WCUSA's proprietary onsite wellness coaching methodology; HIPAA compliance for the coaches' activities as a WCUSA employee; and customer-specific needs, policies, procedures, protocols and resources.   With this extensive training, WCUSA coaches provide targeted, individualized coaching that addresses the specific needs of each customer and the customer's employees.

15.     WCUSA's training and support of coaches continues throughout the coaches' employment with WCUSA.

16.     By training the coaches and giving them the tools to be successful in their jobs, WCUSA provides the coaches with intimate knowledge of WCUSA's unique and proprietary business model, confidential information, and trade secrets.   Accordingly, all WCUSA coaches are required to, and do, execute Employment Agreements that (1) prohibit the coaches from disclosing WCUSA's confidential information during or after their employment with WCUSA; (2) prohibit the coaches from soliciting WCUSA customers and employees during their employment with WCUSA and for a period of two (2) years after their employment; and (3) prohibit the coaches from providing wellness coaching services for any WCUSA client or former WCUSA client for a period of two (2) years after their employment.   A true and correct copy of a representative Employment Agreement executed by certain WCUSA coaches is attached hereto as Exhibit 1, and other WCUSA coaches executed Employment Agreements with very similar non-solicitation and confidentiality provisions.

## WCUSA Grows Its Business Relationship with MGM

17.     MGM, a large resort and entertainment company that develops, builds and operates destination resorts and casinos, entered into a Service Agreement ("Service Agreement") with WCUSA on or about October 20, 2010.

18.     Under the Service Agreement, WCUSA agreed to provide its unique brand of onsite wellness services to MGM's employees at its New York, New York casino and resort in Las Vegas, Nevada.  A true and correct copy of the Service Agreement is attached hereto as Exhibit 2, with Attachment A to the Service Agreement redacted due to its highly confidential content.

19.     Given that performance of the contract necessitates both WCUSA and MGM having access to certain of the other party's confidential information, the parties included a Confidentiality provision in the Service Agreement.  See Exhibit 2, Section 6.

20.     The parties also included a non-solicitation provision in the Service Agreement to prevent MGM from hiring or engaging any of the WCUSA coaches during the term of the parties' Service Agreement and for a one-year period thereafter.  See Exhibit 2, Section 7.

21.     Between December 15, 2010 and August 12, 2014, WCUSA and MGM expanded their business relationship significantly by adding 12 additional MGM properties to the Service Agreement.   The additional properties include:  MGM Grand Detroit; Aria/Vdara; MGM Goldstrike Tunica and Beau Rivage; MGM Monte Carlo; MGM Luxor and Excalibur; MGM Grand Signature; Mandalay Bay; MGM Corporate Office; Mandalay Bay 2; MGM Grand; Mirage; and Bellagio.

22.     The parties further expanded their business relationship by having WCUSA provide additional onsite coaches at various MGM properties covered by the parties' Service Agreement.

23.     The expanded business relationship between WCUSA and MGM was memorialized in a total of eleven (11) Service Agreement Amendment Memos.  An initial Service Agreement Amendment Memo was executed on or around January 10, 2011, and additional Service Agreement Amendment Memos, numbered one (1) through ten (10), were executed between October 2011 and August 2014.  Each Service Agreement Amendment Memo describes the number of coaches or properties being added.  True and correct copies of the Service Agreement Memos are attached hereto as Exhibit 3.

24.     On or around March 13, 2015, at MGM's request, WCUSA and MGM began discussing a revised pricing structure.

25.     During the initial discussions, Jeff Ellis, MGM's Vice President and Chief Financial Officer HRSS, stated that he believed MGM deserved better pricing since MGM was utilizing at least 22 WCUSA coaches.

26.     During the initial discussions, Mr. Ellis also commented to Rob Putnam, WCUSA's Chief Operating Officer, that MGM could hire wellness coaches for less money than what WCUSA was paying its coaches.

27.     In response, Mr. Putnam reminded Mr. Ellis that MGM was prohibited from hiring or otherwise engaging any WCUSA coaches per the parties' Service Agreement.

28.     The parties' discussions nevertheless continued, and on or around April 10, 2015, WCUSA and MGM reached an agreement on a revised pricing structure, subject to approval by Jeff Ellis.

29.     Between approximately April 10, 2015 and June 30, 2015, Rob Putnam repeatedly inquired as to whether Mr. Ellis had approved the revised pricing structure, but was not given a definitive answer.

**MGM Simultaneously Terminates WCUSA's Services
at All Locations, Effective September 1, 2015**

30.     As of June 30, 2015, WCUSA was providing 22 full-time coaches to MGM at 13 different MGM properties.

31.     On June 30, 2015, much to WCUSA's surprise, and without any opportunity for discussion or further negotiation, MGM notified WCUSA in writing that MGM was terminating the Service Agreement, effective September 1, 2015.  A true and correct copy of the June 30, 2015 termination notice, from Jeff Ellis to Rob Putnam, is attached hereto as Exhibit 4.

32.     The very next day, in response to the termination notice, WCUSA advised MGM that a September 1, 2015 termination date for all MGM properties would contravene the terms of the Service Agreement, which provides that WCUSA services for any given property only are terminable at the end of the Service Agreement's Initial Term, or at the end of successive one-year terms upon 60 days' prior written notice.

33.     Indeed, Section 2 of the Service Agreement provides:

> Term; Termination.  The initial term of this Agreement (Initial Term) is for the period beginning upon the date above and ending one year from the Start Date.  The Start Date is the date upon which the Wellness Coaches USA Coach, referenced in Attachment A, begins his/her onsite responsibilities for the

Company.  At the end of the Initial Term, and at the end of each successive term thereafter, this Agreement will automatically renew for a one (1) year period unless either party gives the other at least sixty (60) days prior written notice that it is terminating the Agreement.

See Exhibit 2.

34.  The Start Dates of the current contract term for the various properties covered by those Memos are as follows:  MGM Grand Detroit – 9/1/14; MGM Goldstrike Tunica and Beau Rivage – 9/1/14; MGM Monte Carlo – 9/21/14; MGM Luxor and Excalibur – 10/21/14; New York, New York – 11/15/14; MGM Grand Signature – 12/1/14; Mandalay Bay – 12/1/14; MGM Corporate Office – 12/15/14; Mandalay Bay 2 – 1/1/15; MGM Grand – 3/1/15; Mirage – 3/1/15; Bellagio – 4/1/15; and Aria/Vdara – 8/25/15.

35.  Therefore, the one-year terms at the properties end on different dates, depending on the Start Date for the property.

36.  Significantly, none of the Service Agreement Amendment Memos mentions or amends Section 2, "Term; Termination," of the Service Agreement.  Moreover, each of the Service Agreement Amendment Memos expressly states that "[a]ll other terms and conditions of the existing service agreement remain unchanged."

37.  Accordingly, MGM's termination of all services provided by WCUSA effective September 1, 2015 constitutes an impermissible early termination under Section 2 for 11 of the 13 MGM properties serviced by WCUSA.

38.  Nevertheless, in an effort to resolve the dispute occasioned by MGM's early termination of services at those properties, WCUSA attempted to negotiate with MGM an early termination fee.

39.     MGM was not agreeable to this suggested resolution of the early termination dispute.  As Mr. Ellis put it, MGM had the right to terminate the Service Agreement and, if WCUSA wanted to continue disputing the termination timing, the situation would get "ugly," and MGM would consider the coaches "unfit for duty" and would immediately cancel the Service Agreement.

**LTF Partners with MGM to Provide Onsite Wellness Coaching at MGM Properties**

40.     LTF, which refers to itself as "The Healthy Way of Life Company," operates large, upscale sports, professional fitness, family recreation and spa destinations ("fitness centers").  As of May 2015, LTF was operating 115 fitness centers in the U.S. and Canada, according to its website.

41.     Upon information and belief, LTF never has been in the business of providing wellness coaches dedicated to working face-to-face with employees onsite at the employees' work locations.

42.     Not surprisingly, LTF does not mention anything on its website about onsite wellness coaching at workplaces.

43.     Despite LTF's never having offered face-to-face, onsite wellness services similar to those offered by WCUSA, on or about July 22, 2015, MGM announced to the locations currently served by WCUSA that LTF would be its new partner in employee health and wellness.

44.     Specifically, MGM announced that LTF will provide LTF wellness coaches onsite at MGM properties beginning on September 1, 2015 and that MGM's current partner, WCUSA, no longer would be providing services to MGM.

45.     Notwithstanding the fact that LTF has not previously been in the business of providing onsite wellness services, MGM, in a "Frequently Asked Questions" communication to its employees about the transition from WCUSA to LTF ("FAQs"), made clear that employees could expect no significant changes between the services they received from WCUSA coaches and LTF coaches.

46.     MGM also suggested in its FAQs that employees might have the same wellness coach through LTF as they had through WCUSA.  Specifically, the communication poses the question, "What will change?", and provides the following answer:

> The goal is for your wellness experience to transition smoothly, with minimal changes.  In the event that there is a coaching change, watch for communications that introduce your Coach, including a biography and contact information.

A true and correct copy of that communication is attached hereto as Exhibit 5.

### LTF and MGM Unlawfully Combine Forces to Solicit and Hire WCUSA Employees

47.     Upon information and belief, the services LTF will provide to MGM are substantially similar to those offered by WCUSA to MGM.

48.     Upon information and belief, LTF does not currently have technology, methodology and processes in place to provide the same or similar onsite wellness coaching services to MGM that WCUSA has been providing, such that LTF needs WCUSA wellness coaches to reveal WCUSA's methods of doing business and other confidential information to LTF in order for LTF to successfully provide onsite wellness services to MGM beginning September 1, 2015.

49.     LTF's business plan apparently is to develop the expertise needed to provide onsite wellness coaching by hiring WCUSA coaches and having them use or disclose WCUSA's confidential information and trade secrets to LTF.

50.     In fact, LTF recruiters were reaching out to the WCUSA coaches working at MGM facilities, encouraging them to apply for wellness coach positions at LTF, and even interviewing them by mid-July 2015 — prior to MGM officially announcing its partnership with LTF to MGM employees and prior to WCUSA advising its coaches that WCUSA no longer would be providing services to MGM.

51.     For example, on or about July 17, 2015, an LTF recruiter reached out via LinkedIn to WCUSA coach Christina St. John, who provides services at the MGM Corporate Office.

52.     Upon information and belief, the recruiter advised Ms. St. John about a Corporate Onsite Coach/Program Manager position at LTF that involved the development and delivery of onsite health improvement programs, thereby suggesting that LTF does not currently have a robust onsite wellness coaching program developed and ready to deploy.

53.     Upon information and belief, LTF even managed to contact at least one WCUSA coach via LinkedIn whose profile is marked private, strongly suggesting that MGM was directing LTF to WCUSA coaches who worked at its sites and encouraging LTF to contact them.

54.     LTF further has been reaching out to WCUSA coaches through MGM personnel.

55.     Indeed, MGM management-level employees have been and are continuing to brazenly encourage WCUSA coaches to apply for positions with LTF that would allow them to remain at the MGM sites where they have been working as WCUSA employees.

56.     For instance, on July 20, 2015, Matthew Morrison, Executive Director Healthcare Operations/Corporate Benefits at MGM, wrote to Rob Putnam at WCUSA and inquired whether the service termination date would be extended to September 30, 2015 "in order to allow for coaches to move over to Life Time if they'd like to."   A true and correct copy of this communication is attached hereto as Exhibit 6.

57.     The following day Matthew Morrison advised MGM HR Leadership VPs in an email that:

> While we've been advised that we shouldn't directly request that WCUSA coaches apply with Life Time, the 'Corporate Onsite Health Coach/Program Manager' position has been posted on Life Time's careers site for a few weeks.  We've also moved the Life Time coaching start date from 10/1 to 9/1 in order to avoid employment gaps for any WCUSA coaches that apply for and accept a coaching position with Life Time.

A true and correct copy of this communication is attached hereto as Exhibit 7.

58.     Despite Mr. Morrison's statement that MGM should not request that the WCUSA coaches apply for a position at LTF, MGM management did just that.

59.     Indeed, that same day, July 21, 2015, Megan Nugent, MGM Director of Employee Engagement, reached out to Julia Dulnuan, a WCUSA coach working onsite at Aria, to schedule a meeting with the four (4) WCUSA coaches working at Aria to talk about the transition and share information.

60.     MGM personnel further have been encouraging WCUSA coaches to spread the word about LTF positions to other WCUSA coaches.

61.     For example, Lauren Bendix, Corporate Health Programs Manager at MGM, has been reaching out to WCUSA coaches at MGM, apparently stating that while she cannot say

much under the circumstances, the coaches should reach out to WCUSA coach Christina St. John for more information.

62.     Upon information and belief, MGM personnel also have provided employment references for WCUSA coaches seeking employment with LTF to WCUSA coaches and/or to LTF directly to assist the coaches in obtaining employment with LTF.

63.     Accordingly, MGM and LTF have unlawfully conspired to lure away WCUSA wellness coaches from WCUSA to work for LTF, onsite at the very MGM properties where the WCUSA coaches are currently working as WCUSA employees, so that LTF can use their knowledge of WCUSA's confidential information to provide services to MGM.

64.     In fact, MGM and LTF's unlawful actions already have resulted in LTF making verbal and/or written offers of employment to some of the WCUSA coaches providing services on MGM properties.

65.     Furthermore, on or about August 11, 2015, Matt Nyquist from LTF contacted WCUSA's President, Jay Vandegrift, and left a message stating that LTF wanted to touch base and get WCUSA's perspective about LTF hiring some WCUSA coaches since it was brought to LTF's attention that the WCUSA coaches have non-solicitation agreements.

66.     Moreover, since August 14, 2015, at least 15 of the WCUSA coaches that LTF has offered or plans to offer employment to have reached out to WCUSA, at LTF's urging, asking to be released from their post-employment obligations.

67.     Based upon all of the actions described above, LTF is well aware of the coaches' post-employment obligations and restrictions and is choosing to disregard them in order to gain unfair competitive advantage.

68.     Similarly, MGM is well aware of its contractual obligation prohibiting it from hiring or otherwise engaging WCUSA coaches during the term of the Service Agreement and for a one-year period after the Service Agreement is terminated, yet MGM's actions demonstrate that it is actively circumventing and breaching its contractual obligation.

### LTF and MGM Unlawfully Combine Forces to Misappropriate WCUSA's Confidential Information and Trade Secrets

69.     Upon information and belief, MGM and LTF also are acquiring WCUSA confidential information and trade secrets from WCUSA employees to aid LTF in delivering onsite wellness coaching services at MGM.

70.     For example, LTF openly is pumping WCUSA coaches for confidential information and trade secrets during its interview process.  For instance, prior to completion of in-person interviews, LTF has been emailing WCUSA coaches the following:

> As we continue the hiring process, we are requesting the following items from you:
>
> 2. [sic] An overview of the current hours you work at your property
>
> 3. A list of activities/wellness events that currently exist at your property
>
> 4. A high-level overview of your typical day.

See August 6, 2015 email from Erica Scott, LTF Account Manager, to Joe Agnew, WCUSA coach providing services at Mandalay Bay, a true and correct copy of which is attached hereto as Exhibit 8.

71.     Knowing that it is making improper inquiries, LTF then adds to its instructions: "we ask that you respond with these items by Wednesday August 12, please do so on your own time, outside of your normal working hours."  See Exhibit 8.

72.     Upon information and belief, many WCUSA employees working at MGM properties have provided the requested information to LTF.

73.     Furthermore, upon information and belief, some of the WCUSA coaches have shared their responses with their fellow WCUSA coaches to assist those coaches in obtaining positons with LTF.

74.     LTF, upon information and belief, also has been using its in-person interviews of WCUSA coaches to learn confidential details of how WCUSA operates so that it can replicate WCUSA's business model at MGM properties.

75.     Additionally, upon information and belief, WCUSA coaches have been sharing portfolios of their confidential and trade secret WCUSA work with LTF during their interviews with LTF personnel.

76.     Moreover, since MGM announced its partnership with LTF, some WCUSA coaches that have MGM email accounts have been downloading large files containing WCUSA confidential information and trade secrets to their MGM email accounts.

77.     WCUSA has reason to believe that some WCUSA coaches may have shared and/or will share some or all of the WCUSA confidential information and trade secrets that they downloaded with LTF and/or MGM or otherwise use this information in performing services for LTF at MGM properties.

78.     WCUSA confidential information and trade secrets located in MGM's email systems also may be accessed by MGM to assist LTF in providing onsite wellness services on MGM properties.

79.     Finally, WCUSA coaches hired by LTF to provide onsite wellness coaching at MGM properties undoubtedly will use and/or disclose WCUSA confidential information and trade secrets in the performance of their duties for LTF.

80.     MGM's and LTF's actions are designed to, and/or are resulting in, the misappropriation of WCUSA's confidential information and trade secrets, to the benefit of LTF and MGM and to the great detriment of WCUSA.

### COUNT I (against MGM)
### BREACH OF CONTRACT (TERMINATION)

81.     WCUSA adopts and re-alleges paragraphs 1-80 as if fully set forth herein.

82.     Attachment B Modification #9 (attached to the August 2014 Service Agreement Amendment Memo) lists all properties covered by the Service Agreement between WCUSA and MGM, including an estimated Start Date for each.  See Exhibit 3.

83.     However, as Section 2 of the Service Agreement makes clear, the actual Start Date — which governs the term of the Agreement for that property — is the date on which a coach or coaches began working onsite at the property.

84.     The Start Date, as that term is defined in Section 2 of the Service Agreement, of the current contract term for each of these properties is as follows: MGM Grand Detroit – 9/1/14; MGM Goldstrike Tunica and Beau Rivage – 9/1/14; MGM Monte Carlo – 9/21/14; MGM Luxor and Excalibur – 10/21/14; New York, New York – 11/15/14; MGM Grand Signature – 12/1/14; Mandalay Bay – 12/1/14; MGM Corporate Office – 12/15/14; Mandalay Bay 2 – 1/1/15; MGM Grand – 3/1/15; Mirage – 3/1/15; Bellagio – 4/1/15; and Aria/Vdara – 8/25/15.

85.     MGM failed to give WCUSA the required 60 days' prior written notice of termination per the terms of the parties' Service Agreement for 11 of the 13 MGM properties serviced by WCUSA.

86.     Accordingly, MGM's June 30, 2015 termination of the Service Agreement constitutes a breach of Section 2 as applied to the following properties: MGM Monte Carlo; MGM Luxor and Excalibur; New York, New York; MGM Grand Signature; Mandalay Bay; MGM Corporate Office; Mandalay Bay 2; MGM Grand; Mirage; Bellagio; and Aria/Vdara.

87.     Due to MGM's early termination of WCUSA's services at many of the MGM properties, WCUSA will lose significant revenue and has been deprived of the ability to find other timely opportunities for the coaches who will be displaced in an untimely and improper manner.   Moreover, the early termination has resulted and will result in WCUSA incurring additional expenses to retain coaches when they do not have a work location to service.

88.     Further, by reason of MGM's breach, WCUSA has sustained and, if MGM is not restrained and enjoined immediately and permanently, will continue to sustain irreparable harm for which no adequate remedy at law exists.

**COUNT II (against MGM)**
**BREACH OF CONTRACT (CONFIDENTIALITY)**

89.     WCUSA adopts and re-alleges paragraphs 1-88 as if fully set forth herein.

90.     The Service Agreement between MGM and WCUSA contains the following confidentiality provision:

> Confidentiality.  Each of Wellness Coaches USA and the Company shall maintain in confidence, and shall use and disclose only as necessary for the performance of its rights and obligations hereunder, all Confidential Information that it receives or is disclosed to it in connection with this Agreement, or which it

received or was disclosed to it in the discussions prior to, and leading up to the execution of this Agreement. "Confidential Information" shall include, but not be limited to, the terms of this Agreement, together with any information (whether written, electronic or oral) which relates to the business, affairs, customers, products, services, marketing plan, trade secrets, know-how or personnel of each party to this Agreement (whether marked as confidential or otherwise) and which is disclosed or acquired by one party to the other at any time whether before or after the date of this Agreement. Title and all rights to Confidential Information shall remain vested in the disclosing party. Each party shall assume all information it receives is Confidential Information, unless such information is: (1) prior to any disclosure by the disclosing party generally available to the public; (b) released by disclosing party generally without restriction; (c) independently developed or acquired by receiving party or its personnel without reliance in any way on other protected information of the disclosing party (provided the source of the information did not obtain the information illegally and had the right to disclose it); or (d) information approved by disclosing party for the use of, and disclosure to, the receiving party or its personnel without restriction. Notwithstanding the foregoing restrictions, the receiving party and its personnel may use and disclose any information (x) to the extent required by an order of any court or other governmental authority or (y) as necessary for it or them to protect their interest in this Agreement, but in each case only after the disclosing party has been so notified and has had the opportunity, if possible, to obtain reasonable protection for such information in connection with such disclosure. Each party shall take all reasonable steps, including but not limited to those steps taken to protect that party's Confidential Information, data or other tangible or intangible property that that party regards as proprietary or confidential and that is of similar value or importance to the information disclosed hereunder, to ensure that the information disclosed hereunder is not disclosed or duplicated for others' use to prevent its officers and employees from violating this Agreement.

Exhibit 2, Section 6.

91.     During the nearly 5-year duration of the parties' working relationship, MGM regularly was exposed to WCUSA's confidential information and trade secrets. For example, MGM was exposed to detailed information regarding WCUSA's proprietary process for

providing effective, engaging onsite wellness services; the precise manner in which WCUSA's coaches would interact with MGM's employees to maximize employee engagement; WCUSA's coaching methodology; and WCUSA's technology platform.

92.     MGM also had the benefit of seeing WCUSA's coaches in action, therefore gaining an invaluable first-hand look into the implementation of WCUSA's unparalleled business model.

93.     Upon information and belief, MGM has breached the confidentiality provision of the Service Agreement by sharing WCUSA confidential information with LTF to (a) assist LTF in soliciting WCUSA coaches for hire; (b) to assist LTF in gaining additional WCUSA confidential information during the interview process; (c) to assist LTF in providing onsite wellness coaching to MGM employees; and (d) to assist LTF in illegally replicating WCUSA's business model.

94.     As a result of MGM's breach of the confidentiality provision of the Service Agreement, WCUSA has sustained and will in the future sustain substantial damages, including but not limited to the loss of good will, lost revenue and profits.

95.     Further, by reason of MGM's breach, WCUSA has sustained and, if MGM is not restrained and enjoined immediately and permanently, will continue to sustain irreparable harm for which no adequate remedy at law exists.

**COUNT III (against MGM)**
**BREACH OF CONTRACT (NON-SOLICITATION)**

96.     WCUSA adopts and re-alleges paragraphs 1-95 as if fully set forth herein.

97.    WCUSA coaches are critical to WCUSA's successful implementation of its business model and WCUSA therefore devotes substantial resources to developing its coaches and training them on WCUSA's specific business processes.

98.    MGM has acknowledged the value to WCUSA of maintaining its relationship with the coaches WCUSA employs.

99.    Specifically, the parties' Service Agreement includes the following non-solicitation provision:

> The Company acknowledges and agrees that Wellness Coaches USA has provided substantial training to and support for its employees, and that the loss of any of its employees would result in substantial monetary damages to Wellness Coaches USA.  In consideration thereof, and except as otherwise agreed to by the parties, the Company agrees not to hire as an employee, or otherwise engage as an independent contractor or consultant, any Wellness Coaches USA employee at any time during the term of this Agreement and for a period of one (1) year after termination of this Agreement.

See Exhibit 2, Section 7.

100.    MGM has been and continues to encourage and facilitate the employment of WCUSA coaches by LTF so that the WCUSA coaches can continue to work at MGM properties.

101.    For those WCUSA employees who become LTF employees working at MGM properties, MGM will be engaging them as independent contractors and/or consultants in violation of the non-solicitation provision of the Service Agreement.

102.    As a result of MGM's breach of the non-solicitation provision of the Service Agreement, WCUSA has sustained and will in the future sustain substantial damages, including but not limited to the loss of good will, lost revenue and profits.

20

103.    Further, by reason of MGM's breach, WCUSA has sustained and, if MGM is not restrained and enjoined immediately and permanently, will continue to sustain irreparable harm for which no adequate remedy at law exists.

**COUNT IV**
**TORTIOUS INTERFERENCE WITH CONTRACT (against MGM and LTF)**

104.    WCUSA adopts and re-alleges paragraphs 1-103 as if fully set forth herein.

105.    WCUSA requires all of its wellness coaches to sign Employment Agreements with certain restrictive covenants that prohibit the coaches from disclosing WCUSA's confidential information during or after their employment with WCUSA and from soliciting WCUSA customers and employees during their employment with WCUSA and for a period of two (2) years after their employment.  The restrictive covenants, as set forth in the Employment Agreement attached hereto as Exhibit 1, are as follows:

> 5.    <u>Non-Solicitation of Company Clients</u>.  Employee, during the term of his/her employment with the Company and for a period of two years following Employee's separation from employment with the Company, regardless of the reason, agrees not to solicit, without the Company's prior written permission, any Client/Prospect, as defined herein, for the purpose of (1) becoming or attempting to become employed by, as an employee or contractor or otherwise engaging in a business relationship with, any such Client/Prospect; (2) selling or attempting to sell, on Employee' behalf or on behalf of any other person, business or entity, onsite wellness coaching, or any other workplace wellness related product or service, to any such Client/Prospect; or (3) having any Client/Prospect cease doing business in whole or in part with Company.  For purposes of his Section, a Client/Prospect is any employer, business, company or other person or entity who was a Company client during the term of Employee's employment with Company, or who received a written services proposal from the Company within the six month

period prior to Employee's termination of employment with Company.

6. <u>Non-Solicitation of Employees</u>. Employee, during the term of his/her employment with the Company and for a period of two years following Employee's separation from employment with Company, regardless of the reason, agrees not to cause or attempt to cause, directly or indirectly, any employee, agent, contractor, or consultant of Company (Staff Member) to terminate his or her employment, agency or contractor relationship with the Company; or interfere or attempt to interfere with the relationship between the Company and any Staff Member; or hire or attempt to hire, either directly or indirectly on behalf of Employee or any other entity, any Staff Member, or any person who was a Staff Member at any time during the last six months of Employee's employment with the Company.

7. <u>Confidential Information</u>. Employee recognizes and acknowledges that he/she will have made available to him/her certain confidential information of a proprietary nature concerning the technical, administrative, operational, management, financial and marketing activities of the Company, including, but not limited to, customer lists, specifications, policies and procedures, processes, plans, strategies, cost and financial data, know-how, customer reports, technology and other proprietary trade secrets, particularly information which is identified and treated by the Company as confidential (collectively the "Confidential Information"). It is recognized that the Confidential Information, as it may exist from time to time, is a valuable, proprietary and unique asset of the Company's business. Employee shall not disclose, during his/her employment or at any time after the termination of his/her employment, regardless of the reason, any Confidential Information to any person, firm, company, or other entity. Employee agrees that should he/she be required by court order, subpoena or other government process to disclose any Confidential Information. Employee will provide advance notice to Company and will cooperate with Company in attempting to keep such information confidential.

See Exhibit 1, Sections 5-7.

106.    LTF is aware that the WCUSA coaches have agreements with post-employment restrictions.

107.    LTF is working closely with MGM to solicit and hire the WCUSA coaches working at MGM notwithstanding its knowledge of the restrictions.   Accordingly, MGM is aware of the existence of the Employment Agreements or could reasonably infer their existence based on MGM's business dealings with LTF and/or WCUSA.

108.    LTF and MGM have encouraged, conspired and/or induced WCUSA coaches to terminate their employment with WCUSA and work for LTF as employees and thereby for MGM as independent contractors or consultants, and further to solicit their fellow WCUSA coaches to do the same. Such actions constitute tortious interference with WCUSA's Employment Agreement executed by the WCUSA coaches.

109.    LTF and MGM also have encouraged, conspired and/or induced WCUSA coaches to misappropriate WCUSA confidential information and/or trade secrets for their own use or for the use of MGM and LTF.  Such actions constitute further tortious interference with WCUSA's Employment Agreement executed by the WCUSA coaches.

110.    LTF's and MGM's actions are part of their illegal plan to steal WCUSA's proprietary business model and essential business practices and tools.

111.    By tortiously interfering with WCUSA's Employment Agreements, LTF and MGM have acted intentionally, willfully, maliciously and with reckless indifference to WCUSA's rights.

112.    By LTF and MGM tortiously interfering with WCUSA's Employment Agreements with the WCUSA coaches, WCUSA has sustained and, if LTF and MGM are not restrained and enjoined immediately and permanently, will continue to sustain irreparable harm for which no adequate remedy at law exists.

113.    LTF and MGM are liable for damages suffered by WCUSA as a result of their unlawful actions, in an amount to be determined at trial.

**COUNT V**
**TORTIOUS INTERFERENCE WITH CONTRACT (against LTF)**

114.    WCUSA adopts and re-alleges paragraphs 1-113 as if fully set forth herein.

115.    LTF is aware that MGM is terminating its Service Agreement with WCUSA, effective September 1, 2015.

116.    LTF has encouraged and/or induced WCUSA coaches to terminate their employment with WCUSA and work for LTF as employees and thereby for MGM as independent contractors or consultants. Such actions constitute tortious interference with WCUSA's Service Agreement with MGM, which prohibits MGM from engaging WCUSA coaches as independent contractors or consultants.

117.    LTF also has encouraged, conspired and/or induced WCUSA coaches to misappropriate WCUSA confidential information and/or trade secrets for the use of MGM and LTF. Such actions further constitute tortious interference with WCUSA's Service Agreement with MGM.

118.    LTF's actions are part of its illegal plan to steal WCUSA's proprietary business model and essential business practices and tools.

119.    By tortiously interfering with WCUSA's Service Agreement with MGM, LTF has acted intentionally, willfully, maliciously and with reckless indifference to WCUSA's rights.

120.    By LTF tortiously interfering with WCUSA's Service Agreement with MGM, WCUSA has sustained and, if LTF is not restrained and enjoined immediately and permanently, will continue to sustain irreparable harm for which no adequate remedy at law exists.

121.    LTF is liable for damages suffered by WCUSA as a result of their unlawful actions, in an amount to be determined at trial.

**COUNT VI**
**VIOLATION OF THE NEVADA UNIFORM TRADE SECRETS ACT**
**(against LTF)**

122.    WCUSA adopts and re-alleges paragraphs 1-121 as if fully set forth herein.

123.    WCUSA takes reasonable steps to ensure that its confidential and trade secret information is protected from disclosure by, among other things, requiring both its customers and its employees to sign confidentiality agreements.

124.    WCUSA has executed Employment Agreements with its coaches under which they agree to maintain the confidentiality of WCUSA's confidential information, which is defined therein to include (but is not limited to): specifications, policies and procedures, processes, plans, strategies, cost and financial data, know-how, customer reports, technology and other proprietary trade secrets.  See Exhibit 1.

125.    WCUSA has executed a Service Agreement with MGM under which MGM agreed to maintain the confidentiality of WCUSA's confidential information.  See Exhibit 2, Section 6.

126.    WCUSA also has promulgated and implemented internal policies to protect confidential information and trade secrets including, but not limited to, a policy on protecting company information that expressly prohibits WCUSA employees from discussing the company's confidential business with anyone that does not work for the company and a sensitive data/classification policy that provides a system for protecting WCUSA confidential information.

127.    WCUSA further protects its trade secrets and other confidential information by requiring passwords to access such information through its computers and computer servers, and by labeling certain key information as confidential.

128.    WCUSA's confidential information regarding its methodology, techniques, systems, processes, procedures, and software constitutes trade secrets as that term is defined under the Nevada Uniform Trade Secrets Act. *Nev. Rev. Stat. §§ 600A.010 to 600A.100.*

129.    WCUSA's trade secrets derive economic value from not being generally known to the public or to other persons who can obtain economic value from their disclosure or use.

130.    WCUSA takes reasonable steps under the circumstances, as described above, to maintain the secrecy of its trade secrets.

131.    Upon information and belief, WCUSA's trade secrets are not known outside its business, as evidenced by a lack of other wellness service providers employing WCUSA's unique approach to the provision of wellness services.

132.    Indeed, others could properly acquire WCUSA's trade secrets only with difficulty, as evidenced by LTF's resort to improperly questioning WCUSA's coaches in order to acquire the information.

133.    Upon information and belief, LTF has willfully, maliciously and in bad faith misappropriated WCUSA's trade secrets and other confidential information by improperly acquiring and using WCUSA trade secrets and other confidential information that MGM disclosed to LTF in violation of MGM's Service Agreement with WCUSA.

134.    Upon information and belief, LTF also has willfully, maliciously and in bad faith improperly acquired and used WCUSA trade secrets by virtue of some WCUSA coaches sharing portfolios of their confidential and trade secret WCUSA work with LTF during interviews with LTF personnel.

135.    Further, LTF has willfully, maliciously and in bad faith misappropriated WCUSA trade secrets by working with MGM to willfully induce WCUSA's coaches to reveal WCUSA trade secrets to LTF in violation of both the Service Agreement and the coaches' Employment Agreements.

136.    As a result of LTF's unlawful actions, WCUSA has suffered damages in an amount to be determined at trial.

137.    Further, WCUSA's trade secret and other confidential information has special and unique value for the reasons set forth in this Complaint, such that WCUSA has sustained, and, if LTF is not restrained and enjoined immediately and permanently, will continue to sustain irreparable harm for which no adequate remedy at law exists.

**COUNT VII**
**VIOLATION OF THE PENNSYLVANIA UNIFORM TRADE SECRETS ACT**
**(against MGM)**

138.    WCUSA adopts and re-alleges paragraphs 1-137 as if fully set forth herein.

139.    WCUSA takes reasonable steps to ensure that its confidential and trade secret information is protected from disclosure by, among other things, requiring both its customers and its employees to sign confidentiality agreements.

140.    WCUSA has executed a Service Agreement with MGM under which MGM agreed to maintain the confidentiality of WCUSA's confidential information.  <u>See</u> Exhibit 2, Section 6.

141.    WCUSA also has executed Employment Agreements with its coaches under which they agree to maintain the confidentiality of WCUSA's confidential information, which is defined therein to include (but is not limited to): specifications, policies and procedures, processes, plans, strategies, cost and financial data, know-how, customer reports, technology and other proprietary trade secrets.  <u>See</u> Exhibit 1.

142.    In addition, WCUSA has promulgated and implemented internal policies to protect confidential information and trade secrets including, but not limited to, a policy on protecting company information that expressly prohibits WCUSA employees from discussing the company's confidential business with anyone that does not work for the company and a sensitive data/classification policy that provides a system for protecting WCUSA confidential information.

143.    WCUSA further protects its trade secrets and other confidential information by requiring passwords to access such information through its computers and computer servers, and by labeling certain key information as confidential.

144.    WCUSA's confidential information regarding its methodology, techniques, systems, processes, procedures, and software constitutes trade secrets as that term is defined under the Pennsylvania Uniform Trade Secrets Act.

145.    WCUSA's trade secrets derive economic value from not being generally known to the public or to other persons who can obtain economic value from their disclosure or use.

146.    WCUSA takes reasonable steps under the circumstances, as described above, to maintain the secrecy of its trade secrets.

147.    Upon information and belief, WCUSA's trade secrets are not known outside its business, as evidenced by a lack of other wellness service providers employing WCUSA's unique approach to the provision of wellness services.

148.    Indeed, others could properly acquire WCUSA's trade secrets only with difficulty, as evidenced by LTF's resort to improperly questioning WCUSA's coaches in order to acquire the information.

149.    Upon information and belief, MGM has willfully, maliciously and in bad faith misappropriated WCUSA's trade secrets and other confidential information by improperly using and disclosing to LTF the WCUSA trade secrets and confidential information that MGM acquired as a result of its nearly five (5)-year relationship with WCUSA, in violation of its contractual confidentiality obligations set forth in the parties' Service Agreement.

150.    Additionally, MGM has improperly acquired, and upon information and belief, used and/or will use WCUSA trade secrets by virtue of some WCUSA coaches downloading trade secret information to their MGM email accounts in violation of the confidentiality provision in their Employment Agreements.

151.    Further, MGM has willfully, maliciously and in bad faith misappropriated WCUSA trade secrets by working with LTF to willfully induce WCUSA's coaches to reveal

WCUSA trade secrets to LTF in violation of both the Service Agreement and the coaches' Employment Agreements.

152.     As a result of MGM's unlawful actions, WCUSA has suffered damages in an amount to be determined at trial.

153.     Further, WCUSA's trade secret and other confidential information has special and unique value for the reasons set forth in this Complaint, such that WCUSA has sustained and, if MGM is not restrained and enjoined immediately and permanently, will continue to sustain irreparable harm for which no adequate remedy at law exists.

**COUNT VIII**
**UNFAIR COMPETITION (against MGM and LTF)**

154.     WCUSA adopts and re-alleges paragraphs 1-153 as if fully set forth herein.

155.     WCUSA's confidential information is WCUSA's property.   See Exhibit 2, Section 6 ("Title and all rights to Confidential Information shall remain vested in the disclosing party."); Exhibit 1, Section 7 (acknowledging that WCUSA's confidential information "is a valuable, proprietary and unique asset of the Company's business.").

156.     By the actions described in paragraphs 47-80 above, MGM and LTF have misappropriated WCUSA's confidential information for the benefit of MGM and LTF and to the detriment of WCUSA.

157.     LTF's and MGM's actions are part of their illegal plan to steal WCUSA's proprietary business model and essential business practices and tools.

158.     As a result of MGM's and LTF's unlawful actions, WCUSA has suffered damages in an amount to be determined at trial.

159.   Further, as a result of MGM's and LTF's unlawful actions, WCUSA has sustained and, if MGM and LTF are not restrained and enjoined immediately and permanently, will continue to sustain irreparable harm for which no adequate remedy at law exists.

**COUNT IX**
**CIVIL CONSPIRACY (against MGM and LTF)**

160.   WCUSA adopts and re-alleges paragraphs 1-159 as if fully set forth herein.

161.   Through their above actions, MGM and LTF acted in concert with a common purpose to unlawfully misappropriate WCUSA's confidential information and to solicit, hire and/or otherwise engage WCUSA coaches, all to the detriment of WCUSA.

162.   LTF's and MGM's actions are part of their illegal plan to steal WCUSA's proprietary business model and essential business practices and tools.

163.   Through their above actions, MGM and LTF intended to injure WCUSA.

164.   As a result of MGM's and LTF's unlawful actions, WCUSA has suffered damages in an amount to be determined at trial.

WHEREFORE, WCUSA respectfully requests that this Court enter judgment for WCUSA and against MGM and LTF and:

(1)   Enter a preliminary and permanent injunction enjoining MGM from terminating the Service Agreement as to the following properties effective September 1, 2015 or on any date thereafter that is inconsistent with the termination provision of the Service Agreement:

MGM Monte Carlo

MGM Luxor and Excalibur

New York, New York

MGM Grand Signature

Mandalay Bay

MGM Corporate Office

Mandalay Bay 2

MGM Grand

Mirage

Bellagio

Aria.

(2)     Enter a preliminary and permanent injunction requiring MGM to cease and desist from disclosing any of WCUSA's confidential and/or trade secret information to LTF;

(3)     Enter a preliminary and permanent injunction requiring MGM and LTF to cease and desist from using any of WCUSA's confidential or trade secret information in connection with LTF's engagement with MGM or for any other purpose;

(4)     Enter a preliminary and permanent injunction requiring MGM to cease and desist from violating the non-solicitation clause of the Services Agreement;

(5)     Enter a preliminary and permanent injunction requiring LTF to cease and desist from interfering with the Service Agreement between MGM and WCUSA;

(6)     Enter a preliminary and permanent injunction requiring MGM and LTF to cease and desist from interfering with WCUSA's Employment Agreements with its coaches;

(7)     Order MGM and LTF immediately to preserve and not alter or destroy in any way, any information, including but not limited to all electronic information (defined as all data stored in electronic form on a computer-based system, portable storage devices, or internet cloud storage) which relates in any way to (a) MGM's decision to terminate its Service Agreement

with WCUSA, (b) MGM's decision to engage LTF to provide onsite wellness services to MGM, (c) LTF's and MGM's service agreement (however that agreement may be styled), (d) LTF's research and development of the technology, methodology, and processes it will use to provide services under its agreement with MGM, and (e) MGM's and LTF's communications, since April 10, 2015, with any and all coaches currently or formerly employed by WCUSA;

(8)    Order MGM and LTF to return to WCUSA any and all WCUSA documents in their possession (including electronic documents) or within their control;

(9)    Order MGM and LTF to certify under oath that each has complied with paragraph nos. 7 and 8 above;

(10)    Order MGM and LTF to provide WCUSA with an accounting of the use of WCUSA's trade secrets and other confidential information;

(11)    Award WCUSA damages to be proven at trial, including compensatory and punitive damages, lost profits, and recoupment of any compensation paid to WCUSA coaches formerly engaged at MGM locations for the period of time they did not have a work location to service, together with all costs, interest, and reasonable attorneys' fees; and

(12)     Award such other and further relief as the Court deems just and proper.

Respectfully submitted,

Goodman Law Group, P.C.

By: ___/s/ Ross C. Goodman, Esq._____

Ross Goodman, Esquire
520 S. 4th Street
Las Vegas, NV  89101
T:  (702-383-5088)
F:  (702) 385-5088
email:  ross@goodmanlawgroup.com
Nevada Bar ID No. 7722

*Attorney for Plaintiff*
*Wellness Coaches USA, LLC*

Dated:  August 19, 2015