UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| WELLNESS COACHES USA, LLC,<br><br>    Plaintiff<br><br>v.<br><br>MGM RESORTS INTERNATIONAL; LIFE TIME FITNESS, INC.,<br><br>    Defendants | 2:15-cv-01593-JAD-CWH<br><br>**Order Granting in Part Motion for Temporary Restraining Order [ECF 7] and Setting Plaintiff's Motion for Preliminary Injunction [ECF 8] for Hearing on an Expedited Briefing Schedule** |

Wellness Coaches USA, LLC (WCUSA) moves for a temporary restraining order and a preliminary injunction against MGM Resorts International and Life Time Fitness, Inc. under FRCP 65.[1] Having reviewed WCUSA's complaint,[2] motions and memorandum of points and authorities,[3] supporting declarations and exhibits,[4] and MGM's response,[5] I find WCUSA has met the standard for obtaining narrowly tailored temporary injunctive relief on its claim against MGM for violations of the Pennsylvania Uniform Trade Secret Act and its claim against LTF for violations of the Nevada Uniform Trade Secret Act. I thus grant the motion for temporary restraining order [ECF 7] in part and set the motion for preliminary injunction [ECF 8] for hearing on an expedited briefing schedule. MGM and LTF are restrained from acquiring, disclosing, or using any portion of WCUSA's (1) CoachWell coach support, training, and development infrastructure; (2) StageCoach coaching software and reporting system; (3) Management/Operations Playbook; and (4) Coaches Playbook until further order of this court.

---

[1] ECF 7, 8.

[2] ECF 1.

[3] ECF 7, 8.

[4] ECF 1-2, 7-1, 7-2, 11.

[5] ECF 12.

**Background**

WCUSA sues MGM for breach of contract, tortious interference with contract, violations of the Pennsylvania Uniform Trade Secrets Act, unfair competition, and civil conspiracy.[6] MGM was served with the summons and complaint on August 21, 2015.[7] WCUSA sues LTF for tortious interference with contract, violations of the Nevada Uniform Trade Secrets Act, unfair competition, and civil conspiracy.[8] It does not yet appear that LTF has been formally served with the summons and complaint. None of WCUSA's current or former employees has been made a party to this lawsuit.[9]

WCUSA now moves for a temporary restraining order against MGM and LTF.[10] In support of its motion, WCUSA submits (1) the declaration of Rob Putnam, who has been the Chief Operating Officer for WCUSA since September 2002, with nine exhibits,[11] and (2) the declaration Ashley Mantle, who is the current Director of Operations for WCUSA, with one exhibit.[12] Many of the exhibits attached to the Putnam and Mantle declarations are also attached to WCUSA's complaint.[13]

WCUSA's counsel Ross Goodman certified that on August 25, 2015, a copy of the motion for a temporary restraining order was served via overnight mail through Federal Express on John M. McManus, Esq., the secretary and general counsel for MGM, and Kelly Moffitt, Esq., in-house

---

[6] ECF 1 at 16–31.

[7] ECF 4 at 3.

[8] ECF 1 at 21–31.

[9] *See* ECF 1.

[10] *See* ECF 7 at 4 n. 2 (providing WCUSA does not seek "injunctive relief" in connection with its civil conspiracy claim).

[11] ECF 7-2

[12] ECF 7-1.

[13] ECF 1-2.

counsel for LTF.[14]  Goodman also submitted a declaration detailing the written and verbal notice of the motion for temporary restraints that he and his co-counsel, Philip G. Kircher, provided to officers and in-house counsel for MGM and LTF.[15]  MGM confirms that it received notice of the motion on August 25, 2015, and it has filed a response.[16]  MGM submitted no declaration, affidavit, or exhibit with its response.

## Discussion

The legal standard for issuing a temporary restraining order with notice and the legal standard for preliminary injunctive relief are "substantially identical."[17]  In *Winter v. Natural Resources Defense Council, Inc.*, the Supreme Court clarified that the standards "require[ ] a party to demonstrate 'that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that [a temporary restraining order] is in the public interest.'"[18]  "[I]f a plaintiff can only show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips *sharply* in the plaintiff's favor,' and the other two *Winter* factors are satisfied."[19]  Based on this record, I find that WCUSA has met the standard to obtain a narrowly tailored temporary restraining order on its claims for violations of Nevada's and Pennsylvania's uniform trade secrets acts.

---

[14] ECF 7 at 30.

[15] ECF 11 ¶ 3(a)–(i).

[16] ECF 12 at 1.

[17] See *Stuhlbarg Intern. Sales Co. v. John D. Brush and Co.*, 240 F.3d 832, 839 n. 7 (9th Cir. 2001) (stating that the "analysis is substantially identical for the injunction and the TRO").

[18] *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

[19] *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (quoting with emphasis *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)).

**A.      Likelihood of Success on the Merits**

"Nevada's Uniform Trade Secrets Act, NRS Chapter 600A, provides that the '[a]ctual or threatened misappropriation [of a trade secret] may be enjoined.'"[20] To successfully maintain a claim for misappropriation of trade secrets under Nevada law, the plaintiff must demonstrate (1) the existence of a "valuable trade secret"; (2) "misappropriation of the trade secret through [acquisition,] use, disclosure, or nondisclosure of use of the trade secret"; and (3) that misappropriation was improper because it was made in breach of an express or implied contract or by a party with a duty not to disclose."[21]

Pennsylvania's Uniform Trade Secrets Act likewise allows a court to enjoin "[a]ctual or threatened misappropriation" of trade secrets.[22] Pennsylvania's law—like Nevada's—requires the plaintiff to demonstrate that (1) "knowledge of [plaintiff's] trade secret" was acquired by another; (2) "in circumstances giving rise to a duty to maintain its confidentiality"; and (3) disclosure or use of the trade secret is without plaintiff's consent.[23]

**1.      Existence of Trade Secrets**

"[A] trade secret is information that '[d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by the public,' as well as information that '[i]s subject to efforts that are reasonable under the circumstances to maintain its secrecy.'"[24] "Whether information is a trade secret generally is a

---

[20] *Finkel v. Cashman Prof., Inc.*, 270 P.3d 1259, 1263–64 (Nev. 2012) (quoting NEV. REV. STAT. § 600A.040(1)).

[21] *Kaldi v. Farmers Ins. Exch.*, 21 P.3d 16, 23 (Nev. 2001) (quoting *Frantz v. Johnson*, 999 P.2d 351, 358 (Nev. 2000)); *accord* NEV. REV. STAT. § 600A.030.

[22] 12 PA. CONS. STAT. § 5303(a).

[23] *Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 110 (3d Cir. 2010) (citing 12 PA. CONS. STAT. ANN. § 5302)).

[24] *Finkel*, 270 P.3d at 1264 (quoting NEV. REV. STAT. § 600A.030(5)(a)–(b)); *accord Bimbo Bakeries*, 613 F.3d at 109 (collecting authorities).

question of fact."[25]  The court considers four factors:

> (1) the extent to which the information is known outside of the business and the ease or difficulty with which the acquired information could be properly acquired by others; (2) whether the information was confidential or secret; (3) the extent and manner in which the employer guarded the secrecy of the information; and (4) the former employee's knowledge of . . . [the alleged trade secret] and whether this information is known by the employer's competitors. . . .[26]

An analysis of these factors compels the conclusion that a number of WCUSA's proprietary-information items qualify as trade secrets.

      WCUSA is exclusively in the business of providing onsite wellness-coaching services to corporate employees in their workplaces.[27]  WCUSA deploys trained, professional coaches to its clients' business locations.[28]  The company believes its onsite-delivery methodology is unique in the industry.[29]  WCUSA has shown that it continually invests significant time and resources to train and support its own employees ("coaches") in its unique methodology.[30]

      Rob Putnam, WCUSA's Chief Operating Officer since 2002, attests that WCUSA has spent significant time and resources developing materials, infrastructure, and software platforms to enable its coaches to better provide onsite wellness-coaching services.[31]  He explains that WCUSA developed CoachWell, which is a proprietary coaching support, training, and development infrastructure.[32]  CoachWell contains the methodology that WCUSA developed for onsite wellness coaching, new-hire training materials, and detailed support materials to assist the coaches in

---

[25] *Finkel*, 270 P.3d at 1264 (citing *Frantz*, 999 P.2d at 358).

[26] *Id.* (quoting *Frantz*, 999 P.2d at 358–59); *accord Bimbo Bakeries*, 613 F.3d at 109.

[27] ECF 7-2 at 3 ¶¶ 2, 3.

[28] ECF 7-2 at 3 ¶ 5.

[29] ECF 7-2 at 3 ¶ 6.

[30] ECF 7-2 at 4 ¶¶ 9, 10.

[31] ECF 7-2 at 4 ¶¶ 12, 13.

[32] ECF 7-2 at 3 ¶ 7.

performing their jobs.[33]  Putnam further explains that WCUSA also developed StageCoach, which is a proprietary coaching software and reporting system.[34]  StageCoach allows the coaches to track their daily employee-coach interactions, manage their individual coaching regimens, and assess employee progress.[35]  StageCoach also allows WCUSA management to continually evaluate its coaches' performance and quality, and program outcomes, and to provide WCUSA's clients with progress reports.[36]

WCUSA has demonstrated that CoachWell, StageCoach, and the information they contain are confidential or secret, not generally known outside of WCUSA, and would be difficult to acquire by others outside of the company.  Putnam describes how WCUSA has taken several steps to protect CoachWell, StageCoach, and the information they contain from public disclosure.  For example, the coaches access WCUSA's materials and software platforms using company-issued laptop computers that are equipped with encryption technology.[37]  WCUSA's servers are also equipped with encryption technology.[38]  Passwords are required to access information on WCUSA's computers and servers.[39]  Coaches sign employment agreements that define WCUSA's "Confidential Information" and prohibit employees from publicly disclosing it during and after their employment with WCUSA.[40]  WCUSA likewise requires its clients to execute agreements that define WCUSA's "Confidential Information" and prohibit clients from publicly disclosing it during and after their

---

[33] ECF 7-2 at 4 ¶ 13.

[34] ECF 7-2 at 3 ¶ 7.

[35] ECF 7-2 at 3 ¶ 8.

[36] ECF 7-2 at 3 ¶ 8.

[37] ECF 7-2 at 5, 6 ¶¶ 15, 18.

[38] ECF 7-2 at 6 ¶ 18.

[39] ECF 7-2 at 6 ¶ 18.

[40] ECF 7-2 at 5 ¶ 16, 17 ¶ 7 (Exhibit 1 to Decl. Putnam).

relationship.[41] And many of WCUSA's materials are labeled as "Confidential" or "For Internal Use Only," including its Management/Operations Playbook and Coaches Playbook.[42]

WCUSA provides its coaches opportunities to use their knowledge of WCUSA's business model to provide onsite wellness-coaching services and be part of or lead a team in developing new materials, WCUSA's internship program, WCUSA's recruitment efforts, and new hire onboarding and training.[43] As a result, many of WCUSA's coaches are steeped in an in-depth knowledge of WCUSA's operations, recruiting, training, internship program, and material development.[44] Putnam explains that eight of WCUSA's coaches working at MGM properties serve in one or more of these roles.[45]

Based on this evidence, I find that WCUSA is likely to succeed in demonstrating that its (1) CoachWell coach support, training, and development infrastructure; (2) StageCoach coaching software and reporting system; (3) Management/Operations Playbook; and (4) Coaches Playbook qualify as valuable trade secrets under Nevada and Pennsylvania law.

**2.    Misappropriation of Trade Secrets**

Putnam explains that he was "heavily involved in negotiating" the written agreement between WCUSA and MGM dated October 20, 2010, for WCU to provide "health and injury prevention related services and products" to MGM Mirage.[46] Putnam attests that a true and correct copy of that agreement (with redactions) is attached to his declaration as Exhibit 2.[47] Putnam further explains that the Service Agreement was amended 11 times between December 15, 2010 and August 12,

---

[41] ECF 7-2 at 6 ¶ 17, 22 ¶ 6 (Exhibit 2 to Decl. Putnam).

[42] ECF 7-2 at 6 ¶ 19.

[43] ECF 7-2 at 4–5 ¶ 14.

[44] ECF 7-2 at 4–5 ¶ 14.

[45] ECF 7-2 at 4–5 ¶ 14.

[46] ECF 7-2 at 7 ¶ 22; ECF 7-2 at 21–35 (Exhibit 2 to Decl. Putnam).

[47] ECF 7-2 at 7 ¶ 22.

2014, to add other MGM properties and increase the number of onsite coaches that WCUSA would provide.[48]  Putnam attests that true and correct copies of those amendments are attached to his declaration as Exhibit 3.[49]

In March 2015, MGM requested that WCUSA revise its pricing structure.[50]  According to Putnam, during the pricing negotiations, Jeff Ellis, Vice President and Chief Financial Officer for MGM, commented that MGM deserved a price reduction because it was utilizing 22 of WCUSA's coaches and could "hire wellness coaches for less money than what WCUSA was paying its coaches."[51]  Putnam attests that he responded by reminding Ellis that "MGM was prohibited from hiring or otherwise engaging WCUSA coaches per the parties' Service Agreement."[52]

Thereafter, Putnam states, WCUSA and MGM reached an agreement on a revised pricing structure that was subject to Ellis' approval.[53]  Putnam claims that he made inquiries between April 10 and June 30, 2015, whether Ellis had approved the revised pricing structure, but never received a "definitive answer."[54]  Instead, Putnam says he received written notice from MGM on June 30, 2015, that it was terminating the service agreement with WCUSA effective September 1, 2015.[55]  At that time, WCUSA was providing 22 full-time coaches at 15 MGM properties.[56]

According to Putnam, less than one month after MGM terminated its agreement with WCUSA, MGM announced to its WCUSA-served employees that LTF would be MGM's new

---

[48] ECF 7-2 at 7 ¶ 23–26; ECF 7-2 at 37–59 (Exhibit 3 to Decl. Putnam).

[49] ECF 7-2 at 7 ¶ 26.

[50] ECF 7-2 at 8 ¶ 27.

[51] ECF 7-2 at 8 ¶¶ 28–29.

[52] ECF 7-2 at 8 ¶ 30.

[53] ECF 7-2 at 8 ¶ 31.

[54] ECF 7-2 at 8 ¶ 32.

[55] ECF 7-2 at 9 ¶¶ 34–35; ECF 7-2 at 61–62 (Exhibit 4 to Decl. Putnam).

[56] ECF 7-2 at 8 ¶ 33.

partner to provide employee-health-and-wellness services beginning September 1, 2015.[57] Since MGM announced its partnership with LTF, WCUSA has discovered that some of its coaches have downloaded large files containing WCUSA's confidential information to the coaches' MGM email accounts.[58] It appears that WCUSA can also show that another of its coaches forwarded the login link for the StageCoach system from his WCUSA email account to his gmail account.[59]

WCUSA has learned that, as part of its hiring process, LTF asked in an email for coaches employed by WCUSA to provide LTF with (1) "[a]n overview of the current hours you work at your property"; (2) "[a] list of activities/wellness events that currently exist at your property"; and (3) "[a] high-level overview of your typical day."[60] Some of WCUSA's coaches responded, including J. Gassler who, *inter alia*, provided "a description of all of the specific activities he performs in a typical day, from start to finish, in increments of as little as 15–30 minutes."[61]

Several of WCUSA's coaches who interviewed with LTF indicated to WCUSA's Director of Operations Ashley Mantle "they felt that the LTF recruiters were focused on learning about how WCUSA provides its onsite wellness coaching services at MGM properties, and asked few if any questions about the coaches themselves."[62] Some of those coaches advised Mantle "that LTF is telling them that the job with LTF at MGM properties involves them doing exactly what they are currently doing for WCUSA."[63] Based on her communications with some of WCUSA's coaches,

---

[57] ECF 7-2 at 10 ¶ 45.

[58] ECF 7-2 at 12 ¶ 54.

[59] ECF 7-2 at 13 ¶ 61; ECF 7-2 at 76 (Exhibit 9 to Decl. Putnam).

[60] ECF 7-2 at 12–13 ¶¶ 57–58; ECF 7-2 at 73–74 (Exhibit 8 to Del. Putnam); ECF 7-1 at 4–5 ¶ 13; ECF 7-1 at 8–9 (Exhibit 1 to Decl. Mantle).

[61] ECF 7-2 at 13 ¶ 59; ECF 7-1 at 5 ¶ 14.

[62] ECF 7-1 at 5 ¶ 15. District courts may consider hearsay evidence "in deciding whether to issue a preliminary injunction." *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009) (citing *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1988) (en banc); *Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984)).

[63] ECF 7-1 at 5 ¶ 16.

1  Mantle estimates that LTF has made verbal or written offers of employment to at least 16 of the 22
2  WCUSA coaches presently embedded at MGM properties.[64]

3      It also appears WCUSA can show that MGM's answer to the "What Will Change?"
4  frequently asked question in its MGM-employee directed announcement indicates that LTF intends
5  to provide onsite wellness-coaching services at MGM's properties with coaches that are or were
6  recently employed by WCUSA: "The goal is for your wellness experience to transition smoothly,
7  with minimal changes.  In the event that there is a coaching change, watch for communications that
8  introduce your Coach, including a biography and contact information."[65]  Before MGM announced
9  its partnership with LTF, however, MGM reached out to WCUSA inquiring whether WCUSA's
10 service-termination date could be extended to September 30, 2015, "in order to allow for coaches to
11 move over to Life Time if they'd like to."[66]  MGM "moved the Life Time coaching start date from
12 10/1 to 9/1 in order to avoid employment gaps for any WCUSA coaches that apply for and accept a
13 coaching position with Life Time."[67]

14      According to Putnam, LTF's onsite wellness-coaching business is newly minted and LTF
15 lacks the technology or methodology to provide the same or similar onsite wellness-coaching
16 services that WCUSA provides.[68]  LTF had a posting on its career website for a "Corporate Onsite
17 Health Coach/Program Manager" position for weeks before the MGM-LTF partnership was
18 announced.[69]  And since August 14, 2015, at least 15 of WCUSA's coaches have reached out to
19 WCUSA asking to be released from their post-employment contractual obligations.[70]

---

[64] ECF 7-1 at 6 ¶ 17.

[65] ECF 7-2 at 11 ¶ 46;  ECF 7-2 at 67 (Exhibit 5 to Decl. Putnam).

[66] ECF 7-2 at 11 ¶ 48; ECF 7-2 at 69 (Exhibit 6 to Decl. Putnam).

[67] ECF 7-2 at 11 ¶ 49; ECF 7-2 at 71 (Exhibit 7 to Decl. Putnam).

[68] *See* ECF 7-2 at 10 ¶¶ 43–44.

[69] ECF 7-2 at 11 ¶ 49; ECF 7-2 at 71 (Exhibit 7 to Decl. Putnam).

[70] ECF 7-2 at 12 ¶ 53.

WCUSA has sufficiently demonstrated that it is likely to be able to show that LTF actually misappropriated or threatens to misappropriate WCUSA's trade secrets through improper means or with knowledge that protected information was acquired through improper means. WCUSA has also shown that it can likely demonstrate that MGM actually misappropriated or threatens to misappropriate (and has disclosed to LTF) WCUSA's protected information or with knowledge that this information was acquired through improper means.

### 3.  Wrongfulness, Circumstances Requiring Confidentiality, and Lack of Consent

Putman further attests that WCUSA's coaches executed employment agreements that define WCUSA's "Confidential Information" and prohibit employees from publicly disclosing it during and after their employment with WCUSA.[71] The confidentiality clause defines "Confidential Information" to include the operational, management, personnel, technology, procedures, and processes that WCUSA developed to provide onsite wellness-coaching services.[72]

WCUSA also requires its clients to execute service agreements that define WCUSA's "Confidential Information" and prohibit the client from publicly disclosing it during and after the relationship.[73] WCUSA's evidence shows, and MGM does not dispute, that a valid agreement existed between MGM and WCUSA for WCUSA to provide onsite wellness-coaching services at certain of MGM's properties.[74] The confidentiality clause in the service agreement defines "Confidential Information" to include the operational, management, personnel, technology, procedures, and processes that WCUSA developed to provide onsite wellness-coaching services.[75]

---

[71] ECF 7-2 at 5 ¶ 16; ECF 7-2 at 17 ¶ 7 (Exhibit 1 to Decl. Putnam).

[72] ECF 7-2 at 17 ¶ 7 (Exhibit 2 to Decl. Putnam).

[73] ECF 7-2 at 6 ¶ 17; ECF 7-2 at 22 ¶ 6 (Exhibit 2 to Decl. Putnam).

[74] ECF 7-2 at 7 ¶¶ 22–26; ECF 7-2 at 21–35 (Exhibit 2 to Decl. Putnam); ECF 7-2 at 37–59 (Exhibit 3 to Decl. Putnam); *see also* ECF 12 at 3 (the litigation arises from "an October 20, 2010, contract between MGM and Wellness wherein Wellness was to supply wellness coaching services to MGM employees in several locations").

[75] ECF 7-2 at 22 ¶ 6.

I find that WCUSA has shown it is likely to demonstrate that the actual or threatened misappropriation was wrongful: it was performed in violation of express contracts (employment agreements and service agreement), by parties with a duty not to disclose (WCUSA's employees and client), in circumstances requiring confidentiality (to WCUSA's competitor at time when MGM was shifting from WCUSA to that competitor), and without WCUSA's consent.

**B.     Irreparable Harm**

The second *Winter* factor requires WCUSA to demonstrate that it is likely to suffer irreparable harm if not granted a temporary restraining order. "Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages."[76] WCUSA argues that if MGM and LTF are permitted to acquire, disclose, or use WCUSA's confidential documents, information, and trade secrets, WCUSA will suffer irreparable harm to its business reputation and goodwill.[77] But the harm to WCUSA's business reputation and goodwill, as far as MGM is concerned as WCUSA's client, has already occurred: MGM terminated the service agreement. WCUSA offers no proof that its business reputation and goodwill will be damaged in the eyes of other existing or potential clients. Thus, these alleged harms are too speculative to support a temporary restraining order.[78]

WCUSA's better argument is that it will lose the property interest in its trade secrets and that the value of its trade secrets will be diminished without a temporary restraining order.[79] As other judges in this district have recognized, loss of a property interest in and diminution in value of trade secrets and confidential information are the types of harms that "are not readily addressed through payment of economic damages . . . [and are thus] sufficient to meet the irreparable injury

---

[76] *Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014) (citing *Rent-A-Ctr., Inc.v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991)).

[77] ECF 7 at 25–26.

[78] *See Saini v. Intern. Game Tech.*, 434 F.Supp.2d 913, 919 (D. Nev. 2006) (collecting authorities).

[79] ECF 7 at 25–26.

requirement" for a temporary restraining order.[80] WCUSA is correct that "[p]ublic disclosure of a trade secret destroys the information's status as a trade secret."[81] "This harms the trade secret owner by both depriving him of a property interest and by allowing his competitors to reproduce his work without an equivalent investment of time and money."[82] The Ninth Circuit has likewise recognized that "[d]isclosure of non-trade secret confidential information . . . [is] a serious harm."[83]

    WCUSA has shown it is likely to suffer these irreparable harms in the absence of a temporary restraining order because its evidence establishes: (1) LTF seeks to employ several WCUSA coaches that were located at MGM's properties; (2) LTF sought and obtained at least confidential information about WCUSA from WCUSA's coaches during job interviews and thereafter; (3) several coaches recently downloaded large files containing at least confidential information from their WCUSA email accounts to their MGM email accounts; and (4) at least one WCUSA coach recently forwarded the log-in link to WCUSA's software system to his personal email account, all suggesting that WCUSA's confidential and trade-secret proprietary information is migrating out of WCUSA and into LTF.

    I do not find that WCUSA demonstrated it is likely to suffer irreparable harm with respect its other claims and theories. The other harms claimed by WCUSA: (1) being deprived of adequate time to relocate and deploy the coaches that were serving MGM properties; (2) loss of employees to LTF; and (3) loss of MGM as a client to LTF, can be adequately remedied by monetary damages.

**C.**    **Balance of Equities**

    WCUSA must also establish that "the balance of equities tips in [its] favor."[84] This *Winter* factor requires me to consider the effect that granting or denying temporary injunctive relief will

---

[80] *Saini*, 434 F.Supp.2d at 919.

[81] *Id.* (citing *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984)).

[82] *Id.* (internal citation omitted) (citing *Ruckelshaus*, 467 U.S. at 1002–03; *Winston Research Corp. v. Minnesota Min. & Mfg. Co.*, 350 F.2d 134, 142 (9th Cir. 1965)).

[83] *Id.* (citing *Union Pacific R.R. Co. v. Mower*, 209 F.3d 1069, 1071 n. 1 (9th Cir. 2000)).

[84] *See Winter*, 577 U.S. at 20.

have on each party.[85]  The evidence shows that neither MGM nor LTF has a right to acquire, disclose, or use WCUSA's CoachWell and StageCoach software platforms, Management/Operations Playbook, or Coaches Playbook.  WCUSA has also established that it spent considerable time and resources developing these programs and materials.  This supports the conclusion that WCUSA will suffer irreparable harm if MGM and LTF are permitted to acquire, disclose, or use those items.  WCUSA's proposed restraining order and the scope of the relief it seeks are overly broad.[86]  But a narrowly tailored order temporarily restraining MGM and LTF from acquiring, disclosing, or using WCUSA's CoachWell and StageCoach software platforms, Management/Operations Playbook, or Coaches Playbook should not have any harmful effects on MGM or LTF.  With this limitation, the equities tip sharply in favor of WCUSA.

**D.     Public Interest**

The final *Winter* factor requires me "'to consider whether there exists some critical public interest that would be injured by the grant of'" a temporary restraining order.[87]  I do not perceive any critical public interest that would be injured by a narrowly tailored restraining order that prohibits MGM and LTF from acquiring, disclosing, or using WCUSA's CoachWell and StageCoach software platforms, Management/Operations Playbook, and Coaches Playbook.

**Conclusion**

Accordingly, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that WCUSA's motion for a temporary restraining order **[ECF 7] is GRANTED in part**.  Defendants MGM Resorts International and Life Time Fitness, Inc. including, without limitation, all of their officers, agents, servants, and employees, and all other persons acting in concert or participation with them who receive actual notice of this order, whether acting directly or indirectly, are temporarily restrained from acquiring, disclosing, or using any portion of WCUSA's (1) CoachWell coach support,

---

[85] *Id.* at 24 (quoting *Amoco Prod. Co. v. Villate of Gambell, Alaska*, 480 U.S. 531, 544 (1987)).

[86] *See* ECF 7-3.

[87] *See Alliance for the Wild Rockies*, 632 F.3d at 1138 (quoting *Cal. Pharmacists Assn. v. Maxwell-Jolly*, 596 F.3d 1098, 1114–15 (9th Cir. 2010) (internal quotations omitted)).

training, and development infrastructure; (2) StageCoach coaching software and reporting system; (3) Management/Operations Playbook; and (4) Coaches Playbook until further order of this court.

      IT IS FURTHER ORDERED under FRCP 65(c) that WCUSA must immediately post a bond in the amount of $1,000 to recompense defendants if it is later determined that they have been wrongfully restrained.

      IT IS FURTHER ORDERED that WCUSA's motion for a preliminary injunction **[ECF 8]** will be heard at **9:00 a.m. on Friday, September 18, 2015** in Courtroom 6 D.  Defendants have until **Wednesday, September 9, 2015**, to respond to that motion.  Plaintiff has until **Tuesday, September 15, 2015**, to file any reply.

Dated this 1st day of September, 2015.

_____
Jennifer A. Dorsey
United States District Judge